# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 11 C 8258 | **DATE** | 9/17/2012 |
| **CASE TITLE** | Andres Lozano *et al.* vs. United Continental Holdings, Inc. and Continental Airlines, Inc. | | |

**DOCKET ENTRY TEXT**

Defendants' motion to dismiss Count I of the amended complaint [34] is granted. Defendants should file their motion to dismiss Count II, along with a supporting brief, within 2 weeks of this order. Plaintiffs' response is due two weeks thereafter, and defendants' reply is due 2 weeks thereafter. The Court will rule by mail.

■[ For further details see text below.]

Docketing to mail notices.

## STATEMENT

   **Overview.** On July 2, 2011, the Lozanos (two parents plus their four children) were scheduled to fly on Continental Airlines Flight # 37 from Edinburgh, Scotland to Newark, New Jersey with continued travel to their final destination of Charleston, S.C. During a pre-flight safety check, mechanics discovered a problem with the fuel feed governor. The replacement part was not on hand in Edinburgh. The flight therefore was delayed substantially. The Lozanos arrived in Charleston on July 4th, over 50 hours late. During the delay, Continental offered the Lozanos and other passengers hotel rooms and meal vouchers. However, the Lozanos were not happy with their hotel rooms because they were not connecting, which they felt they needed for their young children. So they found a different hotel better to their liking and paid for it themselves.

   A few months after the flight, the Lozanos contacted the Civil Aviation Authority in London seeking help in securing compensation for the delay and hotel rooms. The CAA was created to protect airplane passenger rights. The CAA wrote a letter on the Lozanos' behalf asking Continental to pay compensation required by a European Union regulation adopted on February 11, 2004. This regulation, known as EU 261, was passed to bolster passenger rights regarding delays and cancellations on flights departing from, or arriving in, an airport located in the EU. The regulation creates a standardized compensation schedule based on distance of flight. If applicable here, it would require Continental to pay 600 Euros or roughly $800 per person, which is approximately $4,800 for the whole Lozano family.

   In response to the CAA letter, Continental wrote back explaining that the delay was caused by a last-minute mechanical problem which Continental believed constituted an "extraordinary circumstance" under EU 261, meaning no compensation is required. Continental noted that it offered passengers hotel rooms and meals, as well as a $300 travel voucher as a goodwill gesture. CAA forwarded the letter to the Lozanos and advised them that they may wish to consider filing a legal claim in the London County Court.

**STATEMENT**

Rather than pursuing their claim there, the Lozanos chose instead to file here in Federal court in Chicago. Perhaps one motivation for switching venues is that the Lozanos (who we'll refer to as plaintiffs from here on out) are bringing this case as a class action, seeking to recover EU 261 damages for every Continental flight since late 2009 which was delayed over 3 hours.

The original complaint contained a single claim for breach of contract. Plaintiffs' theory was that Continental had posted a notice on its website informing passengers about their rights under EU 261 and that this notice was incorporated into Continental's Contract of Carriage. Continental (we use the singular term for both defendants) filed a motion to dismiss. In its 25-page opening brief, it raised four arguments: 1) the contract claim is preempted by the Airline Deregulation Act, 49 U.S.C. § 41713; (2) the claim is preempted by the Montreal Convention; (3) the claim is limited by the Montreal Convention's ban on punitive damages; and (4) EU 261 was never incorporated into the passenger contract.

Before briefing could be completed, plaintiffs filed an amended complaint adding a second claim directly under EU 261. Continental, with plaintiffs' agreement, filed a new motion and brief. But the only additional argument raised against the new count is that it duplicated Count One. Plaintiffs in their response brief disagreed and stated that Count Two differed in that plaintiffs would not be required to show that the website notice was incorporated into the passenger contract. In its reply, Continental complained that because plaintiffs did not give it "proper notice of the precise nature of the second cause of action," Continental was not able to raise arguments directed solely at that count and that it would like the opportunity to do so. In short, there is some confusion about the nature of the two claims; moreover, in reading the briefs, it is not entirely clear whether some or all of the four original arguments relate to one or both claims. However, one argument in the current briefs is clearly directed solely at Count One. It is the incorporation argument. We conclude that the best approach in light of this uncertainty is to address the incorporation argument now in this minute order and then allow additional briefing on arguments directed at the new Count Two.

**Analysis.** We begin with the legal rules. The specific issue is whether the one-page notice on Continental's website (hereinafter, the "EU 261 Notice") is incorporated into Continental's Contract of Carriage based on a provision stating that the contract includes any "terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, or specified on any internet site, or in published schedules." (Ex. 5 at 1.) Neither side in their briefs takes a position on which state's law should apply to this common law claim. The parties only cite to a few cases, and most of them construe Illinois law. We will therefore likewise use Illinois law as our starting point, although we believe the relevant legal principles likely would not vary from state to state.

As the Seventh Circuit has summarized, "a document is incorporated by reference into the parties' contract only if the parties intended its incorporation." *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 736 (7th Cir. 2002). Intent is the central criterion, and this intent must be "clear and specific." *Id.*; *see also Jago v. Miller Fluid Power Corp.*, 615 N.E.2d 80, 82 (1993) (a separate document will be incorporated into a contract only if "that intention is *clearly shown* on the face of the contract") (emphasis added); *Williston on Contract*, §30:25 (updated July 2012) (incorporation by reference is permitted "[a]s long as the contract makes *clear reference* to the document and describes it in such terms that its identity may be ascertained *beyond doubt*") (footnotes omitted; emphasis added). The party seeking to rely on the incorporated terms has the burden of demonstrating that the parties intended to incorporate those terms. *188 LLC*, 300 F.3d at 736-37.

We next turn to the facts. Neither side has argued that there are disputed facts. Both sides rely on the various documents on Continental's website and make arguments based on the ticketing process plaintiffs would have gone through to purchase their tickets. Here is our understanding of this process.

To buy tickets from Continental's website, plaintiffs would have gone to a specific webpage referred to as the point-of-purchase webpage. There they would have filled out information about their flight and entered payment information. To finalize the purchase, they had to click a button labeled "I agree - Continue to Purchase," which contains this statement next to it: "Purchase of this ticket means you agree to all fare rules

**STATEMENT**

associated with this refundable ticket and the terms and conditions in Continental's <u>contract of carriage</u>." Ex. C p.2. The underlined portion is a hyperlink opening the full 44-page Contract of Carriage. Further up the same webpage is a section entitled "Terms and Conditions." This section states: "**Your ticket is a contract.** Your travel is subject to Continental's <u>contract of carriage</u>." (*Id.*; emphasis in original.) Again, the underlining is a hyperlink to the Contract of Carriage. After clicking the "I agree" button, plaintiffs received an electronic ticket and receipt. Ex. A and B. The receipt contains a section entitled "**IMPORTANT CONSUMER NOTICES.**" Here again, it states that plaintiffs are bound by the Contract of Carriage and provides them another hyperlink to the document. The receipt also warns passengers flying internationally that "a treaty known as the Warsaw or the Montreal Convention may apply to the entire journey." Ex. B.

Plaintiffs were thus told repeatedly and clearly that they were bound by the Contract of Carriage; they affirmatively agreed to the Contract of Carriage by clicking the "I agree" button; and they were able to easily view it by clicking one of the many hyperlinks provided (it is not known whether they actually did so). It is fair to say then that the Contract of Carriage is the foundational legal document governing the parties' relationship. This conclusion is reinforced by the text of the document. Its length (44 pages), its language; its structure (*e.g.* a long table of contents followed by six pages of formal definitions) – all unmistakably signify that this is an important, legally binding document. Pertinent to this case, Section 24 of the Contract of Carriage governs flight delays. While we need not review the specific details now, which cover 3 pages, we note generally that it provides a more limited remedy for what is euphemistically called "Schedule Irregularity events" than does EU 261 Although the Contract specifically mentions the Montreal Convention in several places, it never refers to EU 261 or the notice on the website.

As explained above, there is no hint in the ticketing process to alert passengers to the EU 261 Notice on the Continental website – no specific reference to the document, no summary of the rights contained therein, no button to click to acknowledge agreement, no hyperlinks. So how would a passenger come across the document? Plaintiffs point to this general incorporation provision on the first page of the Contract of Carriage:

> Transportation of Passengers and Baggage provided by Continental Airlines, Inc., Continental Micronesia, Inc., and Carriers doing business as Continental Express or Continental Connection, are subject to the following terms and conditions, in addition to any terms and conditions printed on or in any ticket, ticket jacket or eticket receipt, or specified on any internet site, or in published schedules. By purchasing a ticket or accepting transportation, the passenger agrees to be bound thereby.

According to plaintiffs, the reference to terms and conditions "specified on any internet site" is the cue alerting purchasers to go search for terms on Continental's website.

As a practical matter, how would a passenger find the Notice on Continental's website, assuming the passenger were motivated to go looking for it? (Plaintiffs have never alleged they in fact read or relied on the Notice in choosing to book with Continental as opposed to flying with another airline.) A purchaser starting at the Continental homepage would have to click on a button at the top labeled "Travel information," then scroll down the list to the second item from the bottom, entitled "Destination Information." Clicking this button leads to a page with multiple topics. Along the right side of the page is a heading "International Travel" underneath which is a sub-heading "Policy notice for flights departing European Union." Clicking on this link leads to a page containing information about various topics related to the European Union such as rules about importation of products of animal origin. Included on this same page is a PDF icon which, if clicked on, brings up the EU 261 Notice. In sum, a purchaser would have to diligently go through a number of steps and click on various buttons, several of which are vaguely labeled, until finally arriving at the Notice.

With these facts in mind, we return to the legal question – did Continental intend to incorporate the

**STATEMENT**

Notice into the Contract of Carriage? We conclude that Continental merely posted the Notice to comply with EU rules about informing passengers of their rights and that Continental never intended for it to be formally incorporated into the Contract of Carriage. Several undisputed facts support this conclusion.

First, and perhaps dispositive, is the fact that the website itself explicitly and unequivocally states *why* the Notice is being posted. Just above the PDF icon described above, which the purchaser must click on to get a copy of the Notice, is the following statement: "Below is Continental's notice required by EU Regulation 261." (Ex. D at 1.) The words "required by" leave no doubt about Continental's intent. This point is echoed by the first sentence of the Notice, stating that the notice is summarizing "your rights *established by* European Union regulation." *Id.* (emphasis added). If the EU is the one requiring and establishing the rights, then it seems odd to say that Continental is the source of the rights. Plaintiffs' only counter-argument is to suggest that, while Article 14 of EU 261 does require airlines to notify passengers of their rights, Article 14 only requires that notice be given *after* a flight is delayed or cancelled. But this argument misses the mark. The key inquiry for purposes of intent is not what may have actually been required, as strictly determined by a later court, but what Continental *believed* was required. If plaintiffs' theory is true, if Continental had chosen to adopt the regulation on its own volition, say as part of an advertising campaign to distinguish itself as a more customer-friendly airline, then why would Continental undercut this message by saying that the rights were being provided only because Continental was "required" to do so? Plaintiff's argument also overlooks the fact that Continental not only posted the Notice on the website, but also used the same document as the handout to passengers after the flight was delayed, as evidenced by the footer at the bottom of the document stating "EUhandout-English Rev. 11/29/2007."

The fact that the EU required airlines to notify passengers of their rights undercuts plaintiffs' argument that the Notice "reads like a contract" with "affirmative promises of compensation." (Pl. Resp. at 11.) It is true that the Notice in places contains affirmative statements, such as: "If you are involuntarily denied boarding, we will offer you the following free of charge[.]" But these statements are ambiguous in light of Article 14's explicit command to provide passengers with a "text stating your rights." This requirement essentially tells airlines to draft the Notice in a way that will sound like a contract; it is thus not surprising that the Notice contains references to passenger "rights." Still, even then, the Notice also contains many statements written in an indirect style suggesting the rights are imposed from an outside source. For example: "If we reasonably expect to deny boarding on a flight, we are required to seek volunteers . . . ." Who is "requiring" Continental to act this way? It would be awkward to say Continental is requiring itself to take certain actions. Another example: "When we reasonably expect that a flight will be delayed more than four hours, you are entitled to the rights described below." The phrase "you are entitled to" appears often, and it vaguely leaves out *who* is the party granting the entitlement. In our experience, this phrase is more consistent with a governmentally-conferred right than a contractual one.

Viewing the intent question from a larger perspective, if plaintiffs' theory is correct, several puzzling questions arise. Why was no effort made to reconcile the obvious conflict between the EU 261 Notice and the pre-existing and more restrictive delay provisions in Rule 24 of the Contract of Carriage? Why would Continental seek on the one hand to limit passenger rights in Rule 24 and then, on the other hand, try to strengthen them by voluntarily incorporating EU 261? If it did have a desire to voluntarily expand customer rights, then why would it do so in such a circuitous and hard-to-detect manner by posting the Notice in an out of the way spot on its website and then never mentioning it again or providing a link to it? Wouldn't it want to get the benefit in terms of positive customer relations for incurring the added cost? The simpler explanation is that the Notice was posted merely because Continental felt it was required to do so.

In stark contrast is the way Continental dealt with the liability provisions in the Montreal Convention Treaty. The Treaty is explicitly mentioned many times in the Contract of Carriage, as well as in the ticket receipt. Most significantly, it is explicitly incorporated by name into the Contract of Carriage: "For the purposes of international carriage governed by the Montreal Convention, the liability rules set out in the Montreal Convention *are fully incorporated herein* and shall supersede and prevail over any provisions of

**STATEMENT**

this tariff which may be inconsistent with those rules." (Ex. 5 at 39; emphasis added.) The failure to include a similar explicit incorporation provision for EU 261 is telling.

Plaintiffs argue that any ambiguities should be construed against the drafter. (Pls. Resp. at 9; citing *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995); *Restatement of the Law, Second, Contracts*, § 206). In light of the strong evidence regarding intent, we do not believe that this interpretative canon is enough to change the result. As the Seventh Circuit stated in *Baker*, "this canon of construction (*contra proferentem*) is a rule of last resort, a 'tie-breaker' of sorts, that comes into play only when neither the extrinsic evidence nor other methods of construction can resolve the ambiguity." *Id.* at 327. Similarly, the section from the Restatement relied on by plaintiffs goes on to state that "[t]he rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law, as is sometimes true with respect to insurance policies, bills of lading and other standardized documents." *Restatement (Second) of Contracts*, § 206, Comment b.

One final point about plaintiffs' incorporation argument. Although plaintiffs want to treat the language in the Notice as a straightforward contractual promise, they also rely on non-contractual sources to interpret and expand that language. Specifically, they rely on two European Court of Justice opinions – *Sturgeon* and *Wallentin-Hermann* – and on the preamble to EU 261. But the Notice was drafted before the two decisions were handed down. The Notice also does not include the preamble language. If we are to treat the Notice on its own terms, then we would have to resolve questions about whether Continental actually agreed to the Notice only as written or whether it agreed to be bound more broadly by the evolving EU law. One could argue, for example, that the choice to omit the preamble language from the Notice reflects an intent not to be bound by that language. This is another reason why incorporation of the Notice into the contract does not make sense under the facts here.

For the above reasons, we grant the motion to dismiss Count I of the amended complaint. The parties should now brief arguments for dismissing Count Two, in accordance with the briefing schedule set out above. The parties should include in their briefs all the arguments they believe are relevant, even if those arguments were included in earlier briefs. If necessary, the parties may exceed the 15-page limitation without seeking leave of court.